Bradley BURTON, Petitioner,

v.

Barbara BOCK, Respondent.

No. 00–10198–BC.

United States District Court,
E.D. Michigan,
Northern Division.

May 26, 2004.

victed of first- and second-degree criminal sexual conduct following a jury trial in the Kalkaska County, Michigan Circuit Court in 1995 and sentenced to concurrent terms of thirty to sixty years imprisonment on the first-degree count and ten to fifteen years imprisonment on the second-degree count. The petitioner raises claims concerning the prosecution's questions and comments on his post-arrest silence. He also argues that the state trial judge's folksy gloss on the concept of reasonable doubt corrupted the standard instruction later given at the conclusion of the trial to the point of misleading the jury as to the burden of proof that must be met by the State under the Due Process Clause. The Court does not find merit in the petitioner's first claim relating to evidence of his refusal to submit to further questioning by police. However, the Court concludes that the state trial court's instructions to the jury on reasonable doubt impermissibly diminished the State's burden of proof below that required by the Constitution and that there is a reasonable likelihood that the jury convicted the petitioner under a lesser standard. The Court, therefore, will issue a conditional writ of habeas corpus.

Rolf E. Berg, State Appellate Defenders Office, Detroit, MI, for Plaintiff.

Brad H. Beaver, Department of Attorney General, Lansing, MI, for Defendant.

## OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS

LAWSON, District Judge.

The petitioner, Bradley Burton, a state prisoner currently confined at the Thumb Correctional Facility in Lapeer, Michigan, has filed a petition for the writ of habeas corpus through counsel pursuant to 28 U.S.C. § 2254. The petitioner was con-

### I.

The petitioner's arrest and conviction arise from the alleged sexual assault of nine-year-old Agatha and ten-year-old Corrine Goodrich in Kalkaska County, Michigan on January 12, 1995. At the time of the incident, the girls lived with their mother, Dorothea Hankins, and visited their father and his new wife, Carl and Laura Goodrich, on weekends. The petitioner was Ms. Hankins' boyfriend. He occasionally babysat the girls while their mother was at work.

At trial, Agatha, who was turning ten years old, and Corrine, age eleven, both

testified that they played a game of "truth or dare" with the petitioner on January 12, 1995 while he babysat them at a trailer home he shared with another man, Al Bretzloff. During the game, Corrine and Agatha both "mooned" the petitioner. The petitioner pulled down his shorts and dared both girls to touch him with their hands. He also dared them to put their mouths on his penis, and they complied. *See* Trial Tr., vol. I, pp. 63–77, 98–106.

Deanna Huntley, the girls' step-sister, testified that Corrine told her about the incident the weekend after it occurred. Corrine reported that she and Agatha played "truth or dare" with the petitioner. During the game, she (Corrine) dared Agatha and the petitioner to "play with themselves" and dared Agatha to put the petitioner's penis in her mouth. Corrine also said that there were dares for Corrine and Agatha to "play with" the petitioner. After Deanna spoke with Corrine, she had the girls report the incident to her mother and the girls' father.

A social worker, a protective services worker, and a pediatrician testified at trial regarding their contacts with the girls. Additionally, Detective Vencent Woods testified about his investigation of the sexual assault allegations and his conversations with the petitioner. Detective Woods testified that the petitioner came to the police station for questioning but was not placed under arrest. Woods advised the petitioner of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the petitioner signed a waiver form and agreed to speak with him. The petitioner discussed his relationship with the girls, admitted babysitting them on occasion, but denied ever playing "truth or dare" with them. Woods informed the petitioner that he wanted to set up a date for him to speak with other officers. Before the date was set, the petitioner indicated that he was finished talking to police. Trial Tr., vol. II, at 28–32.

The defense called Al Bretzloff, the owner of the trailer where the petitioner stayed, as a witness. He stated that the petitioner brought the two girls over to his trailer to babysit, the girls went into the petitioner's bedroom to go to bed around 8:00 p.m., and the petitioner went into the bedroom between 9:30 p.m. and 10:00 p.m. On cross examination, Bretzloff stated that although he was watching television in the living room next to the bedroom, and the door to the bedroom where the petitioner and the girls were supposedly sleeping was slightly open, he could not fully see into the room and "had no idea what went on in the bedroom." Trial Tr., vol. II at 56.

The petitioner testified on his own behalf at trial. He admitted babysitting the girls on January 12, 1995 and stated that he made them dinner and sent them to bed. He denied playing the "truth or dare" game with them. Trial Tr., vol. II, at 63–72.

At the close of trial, the jury found the petitioner guilty of first-degree and second-degree criminal sexual conduct. The trial court subsequently sentenced him to concurrent prison terms as noted previously.

Following his convictions and sentencing, the petitioner filed an appeal of right in the Michigan Court of Appeals raising several claims of error, including those raised in the present petition. The court of appeals affirmed the petitioner's convictions and sentence in an unpublished *per curiam* opinion. *People v. Burton*, No. 191400, 1998 WL 1992861 (Mich.Ct.App. March 3, 1998). The petitioner filed a delayed application for leave to appeal in the Michigan Supreme Court, which was denied. *People v. Burton*, 459 Mich. 1000, 616 N.W.2d 173 (Mich.1999).

The petitioner, through legal counsel, filed the present petition for the writ of habeas corpus on May 26, 2000, raising the following claims:

I. Petitioner's constitutional right to be free from adverse inferences from his assertion of *Miranda* rights was violated by the prosecutor's elicitation and argument that Petitioner's decision not to answer "further questions" reflected a lack of cooperation and the trial court's refusal to permit Petitioner to mitigate the damage by explaining his actions.

II. Petitioner's constitutional right to a proper jury instruction on reasonable doubt was violated by the instructions which consistently denigrated the standard including a burden shifting requirement that the jury "assign a true, substantive reason" to any doubt before acquitting.

The respondent filed an answer to the petition on November 13, 2000 asserting that the claims should be denied based upon procedural default and for lack of merit.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996), govern this case because the petitioner filed this habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). That Act "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, ——, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003).

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at ——, 123 S.Ct. at 2535 (quoting *Williams v. Taylor*, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); internal quotes omitted). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir.1995) ("We give complete deference to state court findings unless they are clearly erroneous.").

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

The Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409, 120 S.Ct. 1495. The Court defined "unreasonable application" as follows:

[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .

[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410–11, 120 S.Ct. 1495. *See also McAdoo v. Elo,* 346 F.3d 159, 165–66 (6th Cir.2003); *Rockwell v. Yukins,* 341 F.3d 507, 512 (6th Cir.2003) (en banc);

*Lewis v. Wilkinson,* 307 F.3d 413, 418 (6th Cir.2002).

### A.

The petitioner first claims that he is entitled to habeas relief because his Fifth Amendment rights were violated when the prosecution questioned both a police officer and the petitioner concerning the petitioner's decision to stop communicating with police after his initial interview. The respondent asserts that the portion of this claim concerning the police officer's testimony is barred by procedural default and that the remaining claim concerning the prosecutor's cross-examination of the petitioner is without merit.

### 1.

As noted above, Detective Vencent Woods testified about his pre-arrest, post-*Miranda* interview with the petitioner. During his testimony, Detective Woods stated:

Prior to his—Mr. Burton's departure, we had made an arrangement that he would agree to talk to some other police officers about the matter. I—he wanted me to set up a date for that. I made pre-contact with him, kept—like I told him I would. Shortly before the date was set up that he was going to speak to the other officers, he denied [sic] speaking to them and said he was done talking to me.

Trial Tr., vol. II, pp. 31–32. There was no objection to this testimony at the time it was given.

The petitioner raised this issue in his direct appeal, and the court of appeals rejected it for the following reasons:

Defendant first argues that the prosecutor created error requiring reversal by eliciting testimony that defendant decided to remain silent following the administration of *Miranda* warnings, and not to take a lie detector test. We find that,

by making some statements, defendant waived his Fifth Amendment right to remain silent. *People v. McReavy,* 436 Mich. 197, 221, 462 N.W.2d 1 (1990). The facts do not suggest that defendant subsequently was induced to revoke his waiver by implicit assurances contained in *Miranda* warnings. *Id.* at 218–219, 462 N.W.2d 1. It was therefore proper for the prosecutor to question defendant regarding his lack of cooperation with the investigating officers.

*People v. Burton,* 1998 WL 1992861 at *1 (Mich.App.1998).

The doctrine of procedural default provides:

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Such a default may occur if the state prisoner files an untimely appeal, *Coleman,* 501 U.S. at 752, 111 S.Ct. 2546, if he fails to present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir.1994), or if he fails to comply with a state procedural rule that required him to have done something at trial to preserve his claimed error for appellate review, e.g., to make a contemporaneous objection, or file a motion for a directed verdict. *United States v. Frady,* 456 U.S. 152, 167–69, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Simpson v. Sparkman,* 94 F.3d 199, 202 (6th Cir.1996). Application of the cause and prejudice test may be excused if a petitioner "presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust,* 17 F.3d at 162; *see Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Williams v. Coyle,* 260 F.3d 684, 693 (6th Cir.2001), *cert. denied,* 536 U.S. 947, 122 S.Ct. 2635, 153 L.Ed.2d 816 (2002); *see also Warner v. United States,* 975 F.2d 1207, 1213–14 (6th Cir.1992). Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546. "When a state court judgment appears to have rested primarily on federal law or was interwoven with federal law, a state procedural rule is an independent and adequate state ground[ ] only if the state court rendering judgment in the case clearly and expressly stated that its judgment rested on a procedural bar." *Simpson,* 94 F.3d at 202. Whether the independent state ground is adequate to support the judgment is itself a federal question. *Lee v. Kemna,* 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002).

If the last state court from which the petitioner sought review affirmed the conviction both on the merits and, alternatively, on a procedural ground, the procedural default bar is invoked and the petitioner must establish cause and prejudice in order for the federal court to review the petition. *Rust,* 17 F.3d at 161. If the last state court judgment contains no reasoning, but simply affirms the conviction in a standard order, the federal habeas court must look to the last reasoned state court judgment rejecting the federal claim and

apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground. *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

■ The procedural rule in question in this case is the requirement that a criminal defendant object to improper testimony and prosecutorial misconduct in order to preserve such a claim for appellate review. *See People v. Ullah,* 216 Mich.App. 669, 676–77, 679, 550 N.W.2d 568, 573–74 (1996) (citing *People v. Van Dorsten,* 441 Mich. 540, 544–45, 494 N.W.2d 737 (1993) and *People v. Stanaway,* 446 Mich. 643, 687, 521 N.W.2d 557 (1994)). The petitioner does not dispute that the contemporaneous-objection rule was firmly established and regularly followed with respect to these grounds before the petitioner's 1998 trial. *See, e.g., People v. Buckey,* 424 Mich. 1, 17–18, 378 N.W.2d 432, 440 (1985); *People v. Sharbnow,* 174 Mich.App. 94, 100, 435 N.W.2d 772, 775 (1989). Therefore, the state court's reliance on the petitioner's failure to object to the prosecutor's conduct and the trial court's instructions is an adequate and independent state ground for foreclosing review. *Luberda v. Trippett,* 211 F.3d 1004, 1006–07 (6th Cir.2000); *Rogers v. Howes,* 144 F.3d 990, 994 (6th Cir.1998); *see Engle v. Isaac,* 456 U.S. 107, 110, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) (concluding that a petitioner who fails to comply with a state rule mandating contemporaneous objections to jury instructions may not challenge the constitutionality of those instructions in a federal habeas corpus proceeding).

■ Here, the Michigan Court of Appeals rendered the last reasoned opinion rejecting the petitioner's claims. In denying those claims, the court of appeals relied upon a state procedural bar, his failure to object to the testimony. *See Burton,* 1998 WL 1992861 at *1 ("Defendant did not object when the prosecutor first asked a police officer about the defendant's refusal to submit to additional questioning."). The failure to make a contemporaneous objection is recognized as an independent and adequate state law ground for refusing to review trial errors. *Coleman,* 501 U.S. at 750–51, 111 S.Ct. 2546.

■ A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *see also Gravley v. Mills,* 87 F.3d 779, 784–85 (6th Cir.1996). The petitioner neither alleges nor establishes cause to excuse his procedural default. When cause has not been shown, the Court need not consider whether actual prejudice has been demonstrated. *See, e.g., Smith v. Murray,* 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Long v. McKeen,* 722 F.2d 286, 289 (6th Cir.1983).

Further, the petitioner has not established that a fundamental miscarriage of justice has occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S. 298, 326–27, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851.

The petitioner has made no such showing in this case. His jury instruction and prosecutorial misconduct claims are thus barred by procedural default and do not warrant habeas relief.

2.

The petitioner also claims that his Fifth Amendment rights were violated when the prosecutor questioned him on cross-examination about his post-*Miranda* refusal to answer additional police questions or submit to a polygraph ("lie detector") examination, and when the trial court denied him the opportunity to testify that he stopped cooperating with police on the advice of legal counsel. The following exchange occurred during the cross-examination of the petitioner at trial:

Prosecutor: At the conclusion of [Officer Woods'] questions, you said you would be available for additional questions; but then you did not do that. Is that right?

Defendant: He didn't say anything about additional questions. He ask— he said he was gonna contact me— with me about takin' a lie detector test.

Prosecutor: I see. And he did that, didn't he?

Defendant: Yes, he did.

Prosecutor: And you did not do that?

Defendant: Yes and no . . . .

Prosecutor: You did not do what you told him you would do; isn't that correct?

Defendant: I turned his -

The Court: Hold it. Now the Defendant has initiated that remark about lie detector test. The Prosecutor's goin' down that road. The Defendant's wrong for bringing the subject up. The Prosecutor's wrong for goin' down that road. It's irrelevant. They're not admissible in Michigan. The whole subject is totally out of order. He shouldn't have initiated

that remark. The Prosecutor shouldn't pursue it. And I don't know where the defense is goin'. But all three of you gentlemen will just skip the subject . . . it's patently irrelevant in this state. Patently irrelevant. They're not deemed reliable. Anything else of this witness.

Def. Counsel: Your Honor, as to that -

The Court: Sit down, sir. Sit down. Thank you.

Prosecutor: No additional questions, Judge.

Def. Counsel: Your Honor, may counsel approach?

The Court: Any redirect of this witness?

Def. Counsel: Well, I'd like to deal with this lie detector thing, Your Honor. I'd like to have a -

The Court: You say that subject one more time and you and I'll . . . be dealing with each other.

Def. Counsel: No questions, Your Honor.

Trial Tr., vol. II, at 85–86.

■ A prosecutor violates a defendant's constitutional rights when he uses the defendant's post-arrest, post-*Miranda* silence against him at trial under circumstances in which it appears that the defendant's silence was induced by *Miranda* warnings. *See Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The United States Court of Appeals for the Sixth Circuit has explained:

The theory underlying *Doyle* is that while *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and

then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial.

Combs v. Coyle, 205 F.3d 269, 279–80 (6th Cir.2000) (citation omitted).

 However, "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). When the defendant waives his *Miranda* rights and makes a statement to the police "as to the subject matter of his statements, the defendant has not remained silent at all." *Ibid.* If the defendant subsequently refuses to answer further questions, it has been held that the prosecution may note the refusal because it now constitutes part of an otherwise admissible conversation with police. *See United States v. Crowder*, 719 F.2d 166, 172 (6th Cir.1983).

 After waiving *Miranda* rights and answering questions, a defendant may assert his right to remain silent at any time. *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602. However, a prosecutor's reference to subsequent silence does not contravene the rule in *Doyle* unless the defendant's assertion of the right to silence is clear. The mere refusal to answer or respond to a question, without more, does not constitute an assertion or reassertion of the right to silence. *See United States v. Pitre*, 960 F.2d 1112, 1125–26 (2d Cir. 1992).

The Michigan Court of Appeals rejected this aspect of the petitioner's Fifth Amendment claim on the merits, stating:

We find that, by making some statements, defendant waived his Fifth Amendment right to remain silent.... The facts do not suggest that defendant was subsequently induced to revoke his waiver by implicit assurances contained in *Miranda* warnings.... It was therefore proper for the prosecutor to question defendant regarding his lack of cooperation with investigating officers....

Although the prosecutor's question might have signified to defendant an implicit reference to a lie detector test, it was defendant who first mentioned the term "lie detector." Then, given the opportunity, defendant failed to give the simple explanation that he refused to take it on the advice of counsel. Moreover, the isolated reference was brief, and the court immediately ruled that the subject was irrelevant, not admissible, and totally out of order. We find no prosecutorial error.

Burton, 1998 WL 1992861 at *1 ( citations omitted).

Although this Court agrees that the record does not suggest that the petitioner's refusal to engage in follow-up conversation with the police is based on a clear assertion of his right to silence under the Fifth Amendment, it is difficult to conclude from the transcript of the state proceedings that the petitioner was given a fair opportunity to explain his refusal. Rather, the transcript suggests that the prosecutor interrupted the petitioner's response and likely forthcoming explanation. When the petitioner's counsel attempted to conduct redirect examination on the subject, the trial judge threatened him and counsel immediately backed down.

 The Sixth Circuit has held that even when the results of polygraph examinations themselves are inadmissible, the willingness of a person accused of wrongdoing to submit to such a test might be relevant to the question of innocence. *See Murphy v. Cincinnati Ins. Co.*, 772 F.2d 273 (6th Cir.1985). It is not difficult to discern how the refusal to submit to such a test might provoke the opposite inference in the absence of an alternate explanation.

However, the failure to permit such proof, although unfortunate and apparently prompted by the trial judge's acute desire to avoid mention of a polygraph examination, did not amount to a due process violation. "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)). Thus, "[e]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988). Likewise, to prevail on a prosecutorial misconduct claim, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

■ The state trial judge's error in failing to allow the petitioner's attorney to make further inquiry into the reason for the petitioner's refusal to allow continued interrogation, whether or not the subject of a polygraph test was mentioned, was not fundamentally unfair. Moreover, there was only a single testimonial reference to the petitioner's decision to stop speaking with police and not submit to a polygraph examination. Thus, although the Court does not view the record in precisely the same way as the state court of appeals, the Court believes that the court of appeals' decision is neither contrary to nor an unreasonable application of federal law. The petitioner in not entitled to habeas relief on this claim.

**B.**

■ A more fundamental issue is presented by the petitioner's claim that the trial court diminished the degree of proof constitutionally required of the State when the judge commented at the beginning of the trial on the concept of reasonable doubt. In its preliminary instructions to the empaneled jury, the state court made the following statement:

Before any jury in this country can ever find someone guilty, they gotta be satisfied by a standard, by a legal standard. And our country has said from day one that the standard shall be beyond a reasonable doubt. You've heard the terms, haven't ya? We all have. We've read 'em, we've heard 'em. Heaven knows we've been inundated with it in terms of one trial from California. All right.

You'll notice I didn't say something that we've all heard someplace. I don't know where it comes from, but, you know, it just sort of—we hear it. Beyond a shadow of a doubt. Heard it, haven't we? Beyond all doubt. Beyond a shadow of a doubt.

That's certainly not the standard. And if you think about it, beyond all doubt, beyond a shadow of a doubt, we might as well all go home. I'm serious. And I'm not talkin' philosophically here. I'm talkin' about reality. Nothing in this world can be proven beyond all doubt. Nothin'. We'd—let's go home.

Same with the other end of the spectrum. Jurors have said to me on occasion: Well, you know, there's always the possibility of the innocence of the defendant, always the possibility out there, you know, kind of a flimsy, fanciful, out-there philosophy. You know, that's true. There's always that possibility. That being the case, what are we all gonna go home too? So beyond all doubt? Of course not. So what we do

is, we say relax. Bring your experiences of life to a courtroom; bring your reason and bring your common sense. Common sense. What does my common sense tell me. What does my experience tell me. When I'm listening to a witness, what do I know from my experience of life; how's that person responding; the appropriateness of the response; the logic of the response; the truthfulness of the response. We do that every day in life. And that's what you're gonna be doing here.

You're the triers of the facts. Beyond a reasonable doubt is beyond a doubt that you could assign a true, substantive reason to.

Trial Tr., vol. I, at 19–21. The next day at the conclusion of the trial, the judge made reference to this comment and then recited to the jury the pattern criminal jury instruction frequently used by Michigan criminal courts to announce the standard of proof in a criminal case. The transcript indicates:

And you know we talked about reasonable doubt. It's a fair, honest doubt, growing out of the evidence or lack of evidence. It's not merely an imaginary or possible doubt but a doubt based upon reason and common sense. Reasonable doubt is just what the word suggests: a doubt that is reasonable after a careful considered examination of the facts and circumstances of this case.

Trial Tr., vol. II, p. 135.

It is, of course, beyond debate that the State must prove each element of a charged offense beyond a reasonable doubt in order to sustain a conviction. *See In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). This burden of proof has been referred to as "an ancient and honored aspect of our criminal justice system," *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), and, notably, it "plays a vital role in the

American scheme of criminal procedure. Among other things, it is a prime instrument for reducing the risk of convictions resting on factual error." *Cage v. Louisiana,* 498 U.S. 39, 40–41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam) (citation omitted). The Supreme Court has never prescribed specific language that is required to convey the notion of reasonable doubt, and some courts even have found that the term "reasonable doubt" is self-defining and urge trial courts to give no explanatory instruction. *See, e.g., United States v. Walton,* 207 F.3d 694, 696 (4th Cir.2000) ("There is no constitutional requirement to define reasonable doubt to a jury."); *United States v. Thomas,* 774 F.2d 807, 811–12 (7th Cir.1985) ("We have repeatedly admonished district courts not to define 'reasonable doubt' . . . because often the definition engenders more confusion than does the term itself.") (quoting *United States v. Martin–Trigona,* 684 F.2d 485, 493 (7th Cir.1982)).

Michigan's pattern jury instruction on the subject adopts a minimalist approach and does little to convey any meaning of the concept. However, since no definition is required by the Constitution, the instruction by itself does not lessen the State's burden, and the Sixth Circuit has found that it does not violate the Due Process Clause. *See Binder v. Stegall,* 198 F.3d 177 (6th Cir.1999). The question presented by the quoted language in this case is whether the state trial judge's added explanation to the jury undercut the basic instruction on the burden of proof in such a way as to create a reasonable likelihood that the jury applied it in an unconstitutional manner, that is, by allowing a "conviction based on proof insufficient to meet the *Winship* standard." *Victor,* 511 U.S. at 6, 114 S.Ct. 1239 (citing *Estelle v. McGuire,* 502 U.S. 62, 72 & n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)).

The state court of appeals gave the issue short shrift. Its entire pronouncement on the question is set forth here:

Defendant next argues that the trial court's instruction on reasonable doubt consistently denigrated the standard by including a burden shifting requirement that the jury "assign a true, substantive reason" to any doubt before acquitting defendant. We review de novo a claim of instructional error. *People v. Hubbard (After Remand)*, 217 Mich.App. 459, 487, 552 N.W.2d 493 (1996). We find that the judge's instructions, when read in their entirety, did not shift the burden that had to be satisfied, but rather, properly advised the jurors of the prosecutor's burden of proof and required them to have a reason to doubt defendant's innocence. *Id.* at 488, 552 N.W.2d 493.

*Burton*, 1998 WL 1992861 at *1. The standard applied by the state appellate court is not the correct one. The question is not whether the jury instruction "shifted" the burden of proof; the instruction will be held unconstitutional if there was a reasonable likelihood that the jury applied it to convict on lesser proof than the reasonable doubt standard demands. *Victor*, 511 U.S. at 6, 114 S.Ct. 1239.

In *Cage v. Louisiana*, the Supreme Court held that the definition of reasonable doubt set forth below, particularly the emphasized language, offended the Due Process Clause:

"[A reasonable doubt] is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*. It is a doubt that a reasonable man can seriously en-

tertain. What is required is not an absolute or mathematical certainty, but a *moral certainty*."

*Cage*, 498 U.S. at 40, 111 S.Ct. 328 (quoting *State v. Cage*, 554 So.2d 39, 41 (La. 1989)) (emphasis in original). The Court explained that in common parlance, words such as "substantial" and "grave" "suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Id.* at 41. In *Victor v. Nebraska*, the Supreme Court considered those same terms and found that in context, they did not impermissibly reduce the State's burden of proof. There, the challenged instruction in its entirety stated:

"Reasonable doubt" is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, *to a moral certainty*, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the *strong probabilities of the case*, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an *actual and substantial* doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

*Victor,* 511 U.S. at 18, 114 S.Ct. 1239 (emphasis added). The Court focused on the phrase "substantial doubt" and acknowledged that it was "somewhat problematic." *Id.* at 19, 114 S.Ct. 1239. The Court identified two commonly accepted definitions of "substantial:" "On the one hand, 'substantial' means 'not seeming or imaginary'; on the other, it means 'that specified to a large degree.'" *Ibid.* (quoting Webster's Third New International Dictionary, at 2280). Although the first definition is consistent with the State's burden of proof, the second definition "could imply a doubt greater than required for acquittal ·under *Winship.*" *Id.* at 20, 114 S.Ct. 1239. However, the Court found no violation because the context made clear that the use of the term "substantial" did not refer to the "magnitude of the doubt." *Ibid.* Moreover, the entire instruction on reasonable doubt was more expansive and contained multiple definitions.

> In any event, the instruction provided an alternative definition of reasonable doubt: a doubt that would cause a reasonable person to hesitate to act. This is a formulation we have repeatedly approved ... and to the extent the word "substantial" denotes the quantum of doubt necessary for acquittal, the hesitate to act standard gives a common sense benchmark for just how substantial such a doubt must be. We therefore do not think it reasonably likely that the jury would have interpreted this instruction to indicate that the doubt must be anything other than a reasonable one.

*Id.* at 20–21, 114 S.Ct. 1239 (citing *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), and *Hopt v. Utah,* 120 U.S. 430, 439–41, 7 S.Ct. 614, 30 L.Ed. 708 (1887)).

Michigan's standard instruction provides no "common sense benchmark." Rather, it directs the jury to the nature of the evidence, tells them to use their common sense, and then, in a grand display of circularity, "explains" that a "reasonable doubt" is "[a] doubt that is reasonable." By itself, this rendition creates no problem, but it provides no safety net with which to rescue an instruction that is adulterated by additional ambiguous or confusing terminology that tends to dilute the degree of proof denoted by the standard language.

When viewing the jury instructions in their entirety, one is left with the distinct impression that the trial judge adopted a rather cavalier mode of impressing upon the jury the obligation of the prosecutor to prove his case according to the standards required by the Due Process Clause. The trial judge, for reasons not discernable from the record, chose to link the reasonable doubt standard of proof to the public descriptions of "one trial from California," presumably the O.J. Simpson case that received exhaustive media attention. The trial court's apparent exasperation with that proceeding ("Heaven knows we've been inundated with [the term 'reasonable doubt'] in terms of one trial from California"), however, did little to inform the jury of the quantum of proof required for conviction or where it fell on the continuum of proof that ranges from suspicion to possibility to probability to certainty. The modifiers of the term "doubt" used by the trial judge—"substantive" and "true"—likewise were misleading. The dictionary definition of "substantive" includes both "belonging to the real nature or essential part of a thing," and also "of considerable amount or quantity." New Webster's Dictionary of the English Language, at 977–78. The ambiguity is not extinguished by context or alternate definitions of reasonable doubt in this case. Rather, use of the adjective skews the focus at the trial from the quality of the proof of the facts—where it should be—to establishing doubt by some elevated standard of "proof." The instruction suggests that the jury

ought not acquit unless they can find doubt of considerable amount or quantity. Similarly, how one might establish a "doubt" as "true" is nothing short of mystifying. Defining "doubt" of any degree in terms of being true is essentially paradoxical.

The job of a juror is not an easy one. Determining the guilt or innocence of an accused person is serious business. It is not a time to "relax;" rather, it calls for critical attention to the presentation of the evidence, concentration, and even a modicum of skepticism. The jury must be mentally conditioned to demand the degree of proof from the prosecutor required by the Constitution before it can be satisfied to return a guilty verdict. Otherwise, the idea of "proof beyond a reasonable doubt," this ancient and venerable safeguard, would lose its potency as a "prime instrument" insuring against convicting the innocent. This concept, however, is not conveyed to a jury that is told that if it demands too much of the prosecution, "we might as well all go home."

The proofs in the petitioner's state trial pitted the veracity of two pre-teen-age girls—accusing their recently-divorced mother's boyfriend of sexual misconduct—against the word of the petitioner. There were no corroborating witnesses or physical evidence. The jury was called upon to determine if the prosecution's case could stand on its own against the petitioner's frank denials. The jury and the petitioner were entitled to an instruction on the proper burden of proof that was unadorned with the confusing and ambiguous terminology that tended to trivialize the State's obligation to bring forth constitutionally adequate proof. Given the nature of the proofs in the record and the language utilized by the state trial judge in the jury instructions, the Court finds that there is a reasonable likelihood that the jury applied the burden of proof instructions in a manner that allowed a conviction based on proof that was insufficient to meet the standard described by the Supreme Court in *In re Winship*.

■■■ The Court believes that the decision of the Michigan Court of Appeals that the challenged jury instruction did not shift the burden of proof employed an incorrect analysis and constituted an unreasonable application of clearly established federal law as determined by the Supreme Court in *Cage* and *Victor*. Moreover, improperly instructing a jury on the burden of proof in a criminal case is a structural error, and no further assessment of prejudice is required. *See Sullivan v. Louisiana*, 508 U.S. 275, 280, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (eschewing harmless error analysis since, "[t]here being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the same verdict of guilty beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless"). With respect to his second claim, the Court finds that the petitioner has met his burden under 28 U.S.C. § 2254(d).

### III.

The Court does not find that the petitioner's first claim merits relief under 28 U.S.C. § 2254(d). However, the Court concludes that the jury instructions defining the State's burden of proof did not require the State to bring forth evidence that met its burden under the Due Process Clause, and therefore the petitioner's state convictions were returned in violation of the Constitution. The state court of appeals' treatment of this issue was not merely erroneous, but rather it constituted an unreasonable application of federal law where the Supreme Court has condemned burden of proof instructions where there is a reasonable likelihood that a jury applied the instruction to convict on the basis of

evidence that did not meet the standard required by the Constitution. The Court, therefore, will issue the writ of habeas corpus based on the conditions set forth below.

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is **GRANTED**.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings him to trial again within seventy days, subject to the exclusions from such period allowed by 18 U.S.C. § 3161(h).